[Cite as *State v. Smith*, 2023-Ohio-3587.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

DARYL WAYNE SMITH,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 22 BE 0019

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 19 CR 200

**BEFORE:**
Cheryl L. Waite, David A. D'Apolito, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Reversed and Remanded.

---

*Atty. J. Kevin Flanagan*, Belmont County Prosecutor and *Atty. Jacob A. Manning*, Assistant Prosecutor, 52160 National Road, St. Clairsville, Ohio 43950, for Plaintiff-Appellee

*Atty. Christopher P. Lacich*, Roth, Blair, Roberts, Strasfeld & Lodge, 100 East Federal Street, Suite 600, Youngstown, Ohio 44503, for Defendant-Appellant

Dated: September 28, 2023

**WAITE, J.**

{¶1}   Appellant Daryl Wayne Smith appeals multiple judgment entries of the Belmont County Court of Common Pleas, dated September 1, 2021, November 9, 2021, March 24, 2022, March 29, 2022, and April 5, 2022.  Appellant raises both procedural and substantive challenges regarding the convictions involved in this appeal.  His procedural arguments are directed at joinder and juror impartiality.  Substantively, he attacks the denial of his motion to suppress, denial of a Crim.R. 29 motion, and the manifest weight of the evidence.  He also contends that all of the failings in his case amount to cumulative error.  As Appellant's argument regarding the motion to suppress has merit, his remaining arguments are moot.  The judgment of the trial court is reversed and remanded to allow the state to determine if sufficient evidence remains to try the case without the use of any evidence gathered after the officer in this case entered the hotel room occupied by Appellant.

Factual and Procedural History

{¶2}   This matter originated as an investigation of an alleged rape at a Red Roof Inn in St. Clairsville, Belmont County.  The investigation began on March 26, 2019 at the hotel.  During this investigation, law enforcement officers discovered evidence which led to the arrest of Appellant on criminal drug charges.  While Appellant was not ultimately charged with any offense related to the rape or to the drugs that led to his arrest, he was charged with drug-related offenses that occurred after he was transported to the Belmont County Jail.

{¶3}   We must note that the facts as described by the state are somewhat misleading and not entirely accurate.  The trial court's decision appears to be based in part

on those misleading facts. Although the state contends their encounter with Appellant began when police coincidently encountered Appellant in the lobby of the hotel, and that Appellant then invited Corporal Jason Schwarck into his hotel room where drugs were lying in plain view, a recording from Corp. Schwarck's body camera depicts a substantially different encounter.

{¶4} The underlying encounter began after a hotel patron or employee reported the possible rape of a woman named Amber Lopez. Apparently, a hotel employee informed police when they investigated that he saw Lopez in room 116 at some point. Room 116 was occupied by Appellant. Corp. Schwarck arrived at the hotel and happened to find Appellant, a person of interest, at the front desk attempting to re-book his room for another night. Appellant was having some difficulty, however, as the room was not originally rented in his name and hotel employees were aware of the pending investigation.

{¶5} Corp. Schwarck started the recording on his body camera as he began talking to Appellant. When the video begins, Corp. Schwarck asks Appellant if he knows the woman who was staying in the room next door. Appellant replies that he did not, but he had encountered her while at the hotel. Corp. Schwarck informs him that someone at the hotel claimed they saw the woman inside Appellant's room, however, this person was not sure Appellant was in the room at that time. Appellant explains that the woman knocked on his door the previous night, but he did not allow her inside because she appeared to be intoxicated or under the effect of some drug.

{¶6} Corp. Schwarck asks Appellant for his name and driver's license. Appellant provides his name, but says his license is inside his room. This prompts Corp. Schwarck to make a series of disjointed but reassuring comments beginning with "look, we are only

asking because if something does come up, we don't think anything is, but since this other girl left last night, we're just wanting to figure out who was here in case something does come up, you're not in any trouble. We just want to figure it out that way if we ever run into you again, we probably won't ever deal with this again." (Exh. 9, Schwarck Body Cam, :43.)

{¶7} After questioning Appellant about the alleged rape victim, Corp. Schwarck says "look, a detective told me to come up here and talk to you because he didn't even want to come up that's how minor that they think it is." (Exh. 9, Schwarck Body Cam, 2:56.) He continues, "if something comes back on this female and she does make a claim that something happened, I don't want you to be the only one involved." Appellant responds "well, you got my name." (Exh. 9, Schwarck Body Cam, 4:16.) Corp. Schwarck again asks Appellant for his driver's license number and Appellant replies that he does not know it, but ultimately says he will retrieve his license from his room. Corp. Schwarck asks "do you mind if I just walk back with you?" (Exh. 9, Schwarck Body Cam, 4:31.) Appellant agrees, and as they walk alongside a parking lot to access the room Corp. Schwarck reiterates, "like I said, dude, this is not a big deal." (Exh. 9, Schwarck Body Cam, 4:45.)

{¶8} When they reach Appellant's room, Appellant slightly opens the door, then stops and asks a woman inside (who was later determined to be Amber Lopez) "baby, are you decent?" and then "hey, get that little shit cleaned up." (Exh. 9, Schwarck Body Cam, 5:50.) Appellant opens the door just wide enough to allow himself to enter the room by sliding sideways inside and appears to push it shut, as the door begins to return to a closed position. However, Corp. Schwarck clearly pushes the door wide open (since we can see both of Appellant's hands and they are not on the door) and Corp. Schwarck walks into the

room uninvited, essentially on Appellant's heels.  Appellant has his back to the door and does not appear to initially realize Corp. Schwarck has entered the room.  As Appellant walks inside, he immediately can be seen looking for his wallet.

**{¶9}** When the door is opened, Lopez is located at the far side of the room at a sink near the bathroom with her back to the door.  Corp. Schwarck immediately calls Lopez over to him.  Lopez appears very surprised by the visitor, but walks over and attempts to block Corp. Schwarck from entering further into the room.  She appears upset and uncomfortable with his presence inside the room.  When he asks to speak with her, she clearly motions outside and requests that they leave the room.  Corp. Schwarck interrupts her and advises her that she is not in any trouble.

**{¶10}** Corp. Schwarck then notices a small amount of blood on the bed and Lopez informs him that her menstruation cycle had unexpectedly started.  Corp. Schwarck says that it could have been from the rape victim, but Lopez points to her legs (where there is apparently some blood) and the officer laughs.

**{¶11}** By this time, Appellant has located his wallet.  Corp. Schwarck looks at his driver's license and calls into dispatch.  Then he pushes past Lopez, who again tries to block the path along the beds.  He walks towards the sink and announces he has found heroin in plain view on a dresser.  In order to advance into the room, Corp. Schwarck bumps Lopez out of the way.

**{¶12}** At this point, several other deputies arrive at the room.  The deputies detain Lopez, who apparently cannot provide identification.  Corp. Schwarck asks Appellant to wait outside the room.  Appellant asks Corp. Schwarck to hand him his cigarettes, which are on the nightstand closest to the officer.  Corp. Schwarck then finds a baggy containing

Case No. 22 BE 0019

a pill near the cigarettes. At this point, Corp. Schwarck says he is detaining Appellant, and he handcuffs him, cuffing Appellant's hands behind his back. Corp. Schwarck then searches Appellant's person, reaching in his pockets and pulling items out.

{¶13} The other officers start looking around the room, opening the microwave and opening cabinet doors. Corp. Schwarck can be seen searching through Lopez's purse, where he discovers a digital scale. Again, Lopez has previously been taken out of the room. After he searches the purse, he informs another officer that he would ask for Lopez's consent to search the bag. As the officers continue to search the room, Corp. Schwarck says "I think we are going to wait until noon and then search the room because it's in neither one of their names." (Exh. 9, Schwarck Body Cam, 7:10) The following conversation then occurs between Corp. Schwarck and an unidentified deputy:

Deputy: As long as your dope is in plain view, you're good for your search.
Corp. Schwarck: The entire room, you think?

Deputy: Yeah.

Corp. Schwarck: Because there is going to be, it looks like digital scales.

(Exh. 9, Schwarck Body Cam, 7:30.)

{¶14} At the hearing on Appellant's motion to suppress, Corp. Schwarck elaborated on his hesitancy regarding the search they had undertaken, stating "the room expired out of their name or out of the other female's name at noon, and then it would be in the hotel's possession and they could give us consent [to search] at that time." (Motion to Suppress Hrg., p. 249.)

Case No. 22 BE 0019

{¶15} The video also reveals that while other officers search the room, Corp. Schwarck tells them that the blood on the bed might be from the alleged rape. He later states to these officers that it was from the alleged rape victim's menstrual cycle. However, the officers confirmed the rape they were investigating was alleged to have occurred in another room.

{¶16} Corp. Schwarck can be seen leaving the room. Outside, he reads Appellant his *Miranda* rights and starts questioning him again. Corp. Schwarck asks Appellant if he used "molly," stating "it's not a big deal. I'm not trying to use it against you." (Exh. 9, Schwarck Body Cam, 9:10.) Two deputies then search Appellant, including his socks and shoes, a second time. Corp. Schwarck tells another officer that Appellant admitted to using "molly." However, Appellant actually said he thought the drugs found in the room looked like "molly," but that they did not belong to him.

{¶17} Apparently, Lopez initially gave the police a false name. When she reveals her true identity Corp. Schwarck becomes very upset, as he recognizes that she is the woman alleged to have been raped. Lopez explains that she was not raped and did not ask anyone to call the police. Another officer states: "she said she wasn't raped, that's good enough for me." (Exh. 9, Schwarck Body Cam, (8:49.) At this point, it is apparent that the officers' focus had shifted to a narcotics investigation.

{¶18} The officers believed the heroin and scale found in the hotel room belonged to Lopez. However, Appellant was arrested based on Corp. Schwarck's belief that the pills in the baggy belonged to him. The record reveals Appellant was searched a third time before being placed in the cruiser. Again, we note Appellant was handcuffed. A separate video admitted into evidence shows the cruiser in which Appellant is riding arrive in the

protected jail entrance or "sally port" of the jail and shows Appellant exit the vehicle. Although the video does not show Appellant drop any object as he exists the cruiser, a small object can be seen on the ground after the cruiser leaves the sally port. Later, another officer recovers the object, which officers testified contained methamphetamine and cocaine.

{¶19} The resulting criminal case has a unique procedural history due to Appellant's prior incarceration in a West Virginia prison and additional unrelated charges Appellant incurred stemming from actions committed while he waited for trial in this matter.

{¶20} Appellant was not charged with any offense related to the alleged rape or the drugs found inside the hotel room, but on August 7, 2019, Appellant was indicted on one count of aggravated trafficking in drugs, a felony of the third degree in violation of R.C. 2925.03(A)(2), (C)(1)(c), and one count of tampering with evidence, a felony of the third degree in violation of R.C. 2921.12(A)(1), (B). These charges arose from the drugs found in the sally port. Due to Appellant's incarceration in West Virginia at the time, he was not arraigned until February 22, 2021. It is unclear when Appellant was released from West Virginia's custody, however, it appears he had been released prior to this arraignment.

{¶21} At some time before trial in the instant matter, Appellant was again arrested. Appellant's girlfriend, S.B., had apparently sought and received a protection order against Appellant in West Virginia but had not informed him of the order. On January 15, 2022, police were called to a local gas station where S.B.'s uncle alleged that Appellant had assaulted him and swung a baseball bat at him. Officers located Appellant asleep at S.B.'s house. While officers retrieved Appellant from the house, they allowed a woman who had exited the house to enter and sit in the backseat of the cruiser without first searching her,

despite the fact that S.B.'s residence was known as a drug house. After Appellant was transported to the jail, officers located a baggy of cocaine on the backseat floor.

{¶22} On March 3, 2022, more than one year after Appellant's initial arraignment on the charges arising from the sally port incident, the state filed a superseding indictment which included new charges stemming from the incident at S.B.'s house that occurred while Appellant was waiting for trial.

{¶23} The superseding indictment contained the following charges: two counts of aggravated trafficking in drugs, a felony of the third degree in violation of R.C. 2925.03(A)(2), (C)(1)(c); one count of tampering with evidence, a felony of the third degree in violation of R.C. 2921.12(A)(1), (B); possession of cocaine, a felony of the fifth degree in violation of R.C. 2925.11(A), (C)(1)(a); and possession of cocaine, a felony of the fourth degree in violation of R.C. 2925.11(A), (C)(1)(b). The superseding indictment was filed nineteen days before the scheduled trial date on the charges contained in his first indictment.

{¶24} Appellant filed two motions to dismiss, one based on the Interstate Agreement and the second based on speedy trial grounds. The trial court overruled both motions. Appellant then filed a motion to suppress evidence obtained as a result of Corp. Schwarck's entrance into the Red Roof Inn hotel room. The court overruled this motion, also.

{¶25} On March 10, 2022, Appellant was arraigned on the new indictment. The arraignment occurred twelve days before Appellant's scheduled trial. On March 15, 2022, Appellant filed a motion for relief from prejudicial joinder, arguing that joinder of the two different sets of charges would be prejudicial at trial, particularly as trial was set to

commence less than nineteen days after the superseding indictment was filed and twelve days after the arraignment. The court's judgment entry denying the motion was not filed until March 29, 2022, one week after the trial ended.

{¶26} Following a two-day trial, a jury found Appellant guilty on one count of tampering with evidence, one count of possession of methamphetamine amounting to more than three grams but less than fifteen grams, and one count of possession of cocaine. Each of these verdicts pertained to the 2019 incident in the sally port. The jury acquitted Appellant of the charges arising from the 2022 incident at S.B.'s house.

{¶27} On April 5, 2022, the trial court sentenced Appellant to maximum consecutive sentences as follows: thirty-six months of incarceration for tampering, thirty-six months for possession of methamphetamine, and twelve months for possession of cocaine for an aggregate total of eighty-four months, or seven years in prison. The court granted Appellant 137 days of time served.

<u>ASSIGNMENT OF ERROR NO. 1</u>

The trial court erred and abused its discretion when it failed to grant the Appellant's Motion to Suppress Evidence.

{¶28} Appellant challenges the court's denial of his motion to suppress the baggy of drugs found in the sally port following his 2019 arrest. Appellant focuses his arguments on the events that occurred at the hotel, as without Corp. Schwarck's unlawful entrance into that room, officers would not have discovered the drugs he is alleged to have dropped at the police department. Thus, his arguments are based on the fruit of the poisonous tree doctrine.

<u>Case No. 22 BE 0019</u>

**{¶29}** In response, the state argues that Appellant left the hotel room door open for Corp. Schwarck, indicating his implied consent. Further, the state points to Appellant's question posed to his female companion, asking her if she was decent, when he entered the door. The state argues that this suggested Appellant knew Corp. Schwarck intended to enter the room. Once inside, the state asserts that all evidence was in plain view.

**{¶30}** A motion to suppress presents mixed issues of law and fact. *State v. Lake*, 151 Ohio App.3d 378, 2003-Ohio-332, 784 N.E.2d 162, ¶ 12 (7th Dist.), citing *State v. Jedd*, 146 Ohio App.3d 167, 171, 765 N.E.2d 880 (4th Dist.2001). If a trial court's findings of fact are supported by competent credible evidence, an appellate court must accept them. *Id.* The court must then determine whether the trial court's decision met the applicable legal standard. *Id.*

**{¶31}** "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution secure an individual's right to be free from unreasonable searches and seizures and require warrants to be particular and supported by probable cause." *State v. Telshaw*, 195 Ohio App.3d 596, 2011-Ohio-3373, 961 N.E.2d 223, ¶ 12 (7th Dist.). In order for a search or seizure to be lawful, there must be probable cause to believe evidence of criminal activity will be found and the search or seizure must be executed pursuant to a warrant, unless an exception to the warrant requirement exists. *State v. Ward*, 7th Dist. Columbiana No. 10 CO 28, 2011-Ohio-3183, ¶ 33.

**{¶32}** A person may waive Fourth Amendment rights by consenting to a search pursuant to the well-settled law. *Davis v. United States*, 328 U.S. 582, 593-94, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); *Bumper v. North Carolina*, 391 U.S. 543, 548-549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Whether consent was voluntary depends on the totality of

the circumstances surrounding the consent. "To justify a search as consensual, the Fourth Amendment requires that 'consent was, in fact, freely and voluntarily given.' " *State v. Jones*, 1st Dist. Hamilton No. C-220007, 2023-Ohio-844, ¶ 11*, citing *State v. Sieng*, 10th Dist. Franklin No. 18AP-39, 2018-Ohio-5103, ¶ 38.

> Six factors courts consider in determining the voluntariness of consent include: 1) whether the defendant's custodial status was voluntary; 2) whether coercive police procedures were used; 3) the extent and level of the defendant's cooperation; 4) the defendant's awareness of his or her right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence would be found.

*State v. Morris*, 2d Dist. Clark No. 2021-CA-31, 2022-Ohio-94, ¶ 22, citing *State v. George*, 2d Dist. Montgomery No. 25945, 2014-Ohio-4853, ¶ 28.

**{¶33}** First, we must determine whether Corp. Schwarck's entrance into the room was lawful. If it was not, then we undertake an analysis as to whether the drugs which formed the basis for Appellant's arrest were the fruit of the poisonous tree. If so, then we review whether the drugs were discovered in plain view. "When the prosecution relies upon a consent search theory, it has the burden of establishing that the consent was voluntary by a preponderance of the evidence." *State v. Elliott*, 2d Dist. Clark No. 1741, 1983 WL 2424, *5 (May 6, 1983), citing *Bumper v. North Carolina*, 391 U.S. 543, 20 L.Ed.2d 797, 88 S.Ct. 1788 (1968).

**{¶34}** For context, the entire encounter, beginning with Corp. Schwarck approaching Appellant in the hotel lobby, must be addressed. Corp. Schwarck activated

his body camera as he spoke to Appellant in the hotel lobby. Corp. Schwarck asked Appellant his name, which he provided. Corp. Schwarck then asked for his driver's license number and after some time, Appellant said he would have to go to his room to retrieve his license. Corp. Schwarck asked if he could "just walk" with him and Appellant responded in the affirmative.

{¶35} Corp. Schwarck concedes that Appellant never expressly invited him inside the room. Instead, he contends Appellant held the door open for him, allowing him to enter. However, this assertion is contrary to the action observed in watching the bodycam video. The focus of this analysis must be on Appellant's behavior and whether it could be construed to provide Corp. Schwarck with implied consent to enter the room.

{¶36} As Appellant opened the door a few inches, he asked Lopez if she was "decent." He opened the door only wide enough for him to slide into the room sideways as he spoke to Lopez. As Appellant entered the room, the door begins closing behind him. However, Corp. Schwarck then appears to push the door back open, wide, as evidenced by an abrupt change in the direction of the door's swing. Appellant's hand is visible, and is at his side. It is clear Appellant did not open the closing door. After pushing the door wide open, Corp. Schwarck quickly followed Appellant into the room, essentially on his heels. Appellant walked inside with his back to the door and immediately began looking for his wallet.

{¶37} Although Corp. Schwarck's stated purpose for following Appellant to the room was to verify his driver's license, he immediately ordered Lopez over to him as he entered. Clearly surprised that Corp. Schwarck was inside, she nonetheless walked over and he said he needed to speak with her. Lopez positioned herself in a way to block Corp.

Schwarck from entering the room and gestured towards the door as she told Corp. Schwarck they could speak outside. However, Corp. Schwarck interrupted her and assured her that she was not in any trouble. He then bumped her aside and walked past her, all the way to the back of room, where he announced his discovery of heroin on a dresser across the room. Thus, contrary to the state's arguments, the video evidence reveals Appellant tried to close the door, and did not know Corp. Schwarck entered the room behind him. It is Corp. Schwarck who opened the door Appellant was closing. Lopez clearly demonstrated she did not consent to his entrance into the room.

**{¶38}** Significantly, Corp. Schwarck can be heard during the video, as he and other officers are obviously searching the room, telling the other deputies to wait until noon to begin a search of the room because at that point the hotel was lawfully able to consent to the search. The other deputies opined that no consent was needed because contraband had been found in plain view. Corp. Schwarck hesitated but eventually agreed to immediately continue with the search. This hesitancy supports that he knew he did not have consent to enter the room in the first place. Otherwise, he would not have been concerned about securing consent from the hotel management.

**{¶39}** Also relevant to this discussion is Appellant's instruction to Lopez to "[c]lean that little shit up." Corp. Schwarck said he believed this meant he was permitted to enter the room because the occupants were cleaning before allowing in a guest. However, Corp. Schwarck gave the woman no time to clean anything before he entered the room. Again, he is clearly seen pushing past Lopez in her attempt to prevent him from further entering the room. We note that no drugs were found near the room's entrance.

**{¶40}** The state cites to several cases, mostly federal, where a suspect opening a door resulted in the determination he or she gave valid consent. However, all of these cases are factually distinguishable from the instant matter. See *United States v. Griffin*, 530 F.2d 739 (7th Cir.1976) (the appellant behaved in a manner suggesting he knew he could refuse consent. He then opened the door for law enforcement, stepped back, left the door open, and led the officers inside the room); *Robbins v. MacKenzie*, 364 F.2d 45 (1st Cir.1966) (the appellant opened the door, stepped back, and allowed the officers to enter the room); *Elliott, supra* (the appellant told officers to "come on in" as he opened the door); *State v. Schroeder*, 6th Dist. Wood No. WD-00-076, 2001 WL 1308002 (Oct. 26, 2001) (officers obtained a search warrant based on an odor of burning marijuana as the door opened); *United States v. Turbyfill*, 525 F.2d 57 (8th Cir.1975) (a third party opened the door for officers); *State v. Asworth*, 10th Dist. Franklin No. 90AP-916, 1991 WL 54181 (April 11, 1991) (third party allowed officers inside the room).

**{¶41}** Aside from the problem of Corp. Schwarck's initial entrance, the video's depiction of all of the officer's subsequent behavior is also disturbing. In addition to entering the room without consent, Corp. Schwarck undertook a search of Lopez's purse and found contraband, at the same instant he informed the other officers that he would later ask for her consent to search the bag. Although not at issue, here, the bag was clearly subjected to a search violative of the Fourth Amendment. Neither Lopez, nor Appellant were located anywhere near the bag. By his comments, Corp. Schwarck apparently knew he was prohibited from searching the purse absent consent or a warrant. As the officers debated whether they were able to lawfully search the room, they were actively searching the room. The officers can be seen opening doors and rummaging through items. Again, we note

that Appellant was never charged with crimes regarding the drugs found in the room, not even the drugs that apparently formed the basis for Appellant's arrest. This also appears to support a conclusion that the officers knew the search was unlawful.

**{¶42}** It is apparent from the video of this matter that Appellant did not provide any form of consent for Corp. Schwarck to enter the room. Thus, the search of this room violated the Fourth Amendment. But for this search, the officers would not have observed any contraband. As such, we must review whether the drugs found in the sally port, which formed the basis for Appellant's charges, were also inadmissible as fruit of the poisonous tree.

> The exclusionary rule requires suppression of evidence obtained as a result of an unlawful search and derivative evidence that is the product of the primary evidence or is otherwise acquired as an indirect result of the unlawful search, unless the connection with the unlawful search is so attenuated that the taint is dissipated. *Murray v. United States*, 487 U.S. 533, 536-37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). The question is whether the taint is sufficiently dissipated or whether the evidence is the fruit of the poisonous tree. *Segura v. United States*, 468 U.S. 796, 804-805, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

*State v. Nickelson*, 7th Dist. Belmont No. 16 BE 0039, 2017-Ohio-7503, ¶ 27.

**{¶43}** At trial, testimony was given that the drugs dropped in the sally port matched the type of drugs found on the hotel nightstand. In addition, Corp. Schwarck repeatedly told officers at the scene that he believed more drugs might be involved and to make sure

Case No. 22 BE 0019

both suspects were subjected to a body scan at the jail. Thus, the drugs found in the sally port and attributed to Appellant (which are at issue in this case) were directly related to the unlawful hotel room search. They are a fruit of the poisonous tree. In fact, it is dubious that, but for the unlawful entrance into the room and its search, Appellant would have been taken into custody at all. Appellant's first assignment of error has merit and is sustained. On remand, all the evidence obtained following Corp. Schwarck's entrance into the hotel room and any discussion relating to the unlawful search is to be suppressed as inadmissible.

ASSIGNMENT OF ERROR NO. 2

The trial court committed error and abused its discretion when it denied Appellant's Motion for Relief from Prejudicial Joinder (Motion to Sever) as well as an oral motion to continue the trial due to a superseding indictment less than 21 days before trial.

{¶44} Ohio law favors joining multiple criminal offenses in a single trial. *State v. Harrison*, 7th Dist. Jefferson No. 19 JE 0009, 2020-Ohio-3624, ¶ 55, citing *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991), citing *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). "[J]oinder and the avoidance of multiple trials is favored for many reasons, among which are conserving time and expense, diminishing the inconvenience to witnesses and minimizing the possibility of incongruous results in successive trials before different juries." *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981).

{¶45} Crim.R. 8(A) provides:

Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

**{¶46}** A defendant may move to sever trial of joined offenses pursuant to Crim.R. 14 if he can establish prejudice. *Lott, supra*, at 163. In relevant part, Crim.R. 14 provides: "If it appears that a defendant or the state is prejudiced by * * * such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires."

**{¶47}** The state may counter a claim of prejudice in one of two ways. The state may demonstrate that the evidence presented at trial for each offense was simple and direct. *State v. Moore*, 2013-Ohio-1435, 990 N.E.2d 625, ¶ 23 (7th Dist.), citing *State v. Coley*, 93 Ohio St.3d at 259, 754 N.E.2d 1129 (2001). Failing that, the state must show that all of the evidence presented at the combined trial would have been admissible in each case if tried separately. *Id.* If the state can demonstrate that the evidence is simple and direct, then it is not required to prove the stricter admissibility test. *State v. Harris*, 7th Dist. Mahoning No. 13 MA 37, 2015-Ohio-2686, ¶ 29, citing *State v. Johnson*, 88 Ohio St.3d 95, 109, 723 N.E.2d 1054 (2000). Evidence is simple and direct when it is apparent that the jury was not confused about which evidence proved which act. *Harrison* at ¶ 60, citing *State v. Harris*, 7th Dist. Mahoning No. 13 MA 37, 2015-Ohio-2686, ¶ 30; *Coley* at 259.

**{¶48}** Appellant explains that the superseding indictment was filed just nineteen days before trial and the arraignment was held twelve days before trial was set to commence. He immediately filed a motion to continue the trial, as discovery and motion practice were necessary based on the new charges. Despite the state's decision not to object to the request, the trial court denied the motion and allowed the matter to proceed to trial as scheduled.

**{¶49}** While we are certainly troubled by the facts of this case and the court's failure to completely address Appellant's concerns about the joinder in the matter and, in particular, the timing of the indictments, as Appellant was acquitted of the charges in the other case joined with this matter for trial, this assignment of error is moot.

<u>ASSIGNMENT OF ERROR NO. 3</u>

The trial court committed error and abused its discretion when it failed to strike a juror for cause, over defense counsel's objection, when it was revealed only during voir dire that the prospective juror's best friend was dating one of the police officers who was a witness at trial for the state.

<u>ASSIGNMENT OF ERROR NO. 4</u>

The trial court erred and abused its discretion when it failed to grant the Appellant's Rule 29 Motion for, he was convicted on legally insufficient evidence on the charges of Tampering with Evidence, Possession of Methamphetamine, and Possession of Cocaine.

<u>Case No. 22 BE 0019</u>

ASSIGNMENT OF ERROR NO. 5

The trial court erred and abused its discretion when it failed to reverse the Appellant's convictions for the same were against the manifest weight of evidence.

ASSIGNMENT OF ERROR NO. 6

The Appellant is entitled to a new trial, all as a result of the cumulative errors set forth herein.

{¶50} Based on our decision in the first assignment of error, the issues raised in these assignments of error are moot.

Conclusion

{¶51} Appellant presents several arguments that challenge procedural and substantive issues. Appellant's arguments regarding his motion to suppress has merit. Accordingly, the judgment of the trial court is reversed and remanded to allow the state to determine if the case can be retried without any of the suppressed evidence, and based solely on police encounters with Appellant prior to any officer's entrance into his hotel room.

D'Apolito, P.J., concurs.

Hanni, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, Appellant's first assignment of error is sustained and his remaining assignments are moot. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is reversed. This matter is remanded to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**